By the Court.
 

 The relators, who are directors of the University of the City of Cincinnati, instituted an original action in this court against the director of public safety of that city, praying that a writ of mandamus issue against the respondent commanding him to cause to be made at the expense of the relators the equipment of ward 0-3 for the purpose of surgical research, and that the respondent be commanded to give suitable directions in that behalf.
 

 The respondent answered, and the cause came on to be heard upon a, general demurrer to the answer, which not only challenges the answer but searches the petition as well. The pleadings are
 
 *265
 
 voluminous, incorporating, as they do, certain provisions of the city charter together with the rules and regulations adopted respectively by the city authorities and by the trustees of the University. The various regulations adopted by these several bodies relate chiefly to the government, administration, medical work, teaching, and nursing in the Cincinnati general hospital.
 

 Many of the allegations contained in the pleadings relate to questions of policy underlying the adoption of such rules and regulations, and need not be considered' in arriving at the decision, of this cause.- The director of public safety maintains that the power of setting aside a ward for surgical research or other hospital purposes rests in him as an official of the city, and is not vested in the board of directors of the University of the City ■ of Cincinnati:' A dual control in that respect is necessarily incompatible, and it is therefore required that this, court should decide in whose hands is lodged the power of setting aside a ward of the general hospital for surgical or hospital purposes.
 

 The decision of that question rests upon the controlling facts alleged in the pleadings, especially those admitted ■ in the" answer1; It appears from the' pleadings that, long prior to the adoption of the city charter, the city of Cincinnati erected a general hospital, and' that more than $2,365,000 was expended by the city in its erection, equipment, and furnishing, which' sum'was derived from the sale of bonds authorized for that purpose. This hospital consisted of a group of 24 buildings, divided into a number of wards, which were' capable
 
 *266
 
 of being altered and subdivided into other •wards.These wards were allotted to various professional services specifically enumerated in the answer of the respondent, including wards C-l and 0-2, which were set apart for purposes of surgery.
 

 In July,. 1923, the University board of directors deemed it necessary to set aside ward C-3 of the general hospital for the purpose of surgical research, and passed a resolution to that effect. The resolution, however, provided that the expense of equipment and maintenance of that ward should be paid out of the income of the trust funds under the control of the University board, except such expenses as should be borne in whole or in part by the patients admitted thereto. At the same time the University directors resolved that the hospital surgical staff and other resident surgeons of the city should be allowed to take private patients into the ward, for which such surgeons were permitted to receive compensation.
 

 It is admitted that the city of Cincinnati pays for the repairs and maintenance of the buildings, and that it pays also the employes of the hospital, including the superintendent thereof. Forty per cent, of the number of nurses in the hospital are paid by the city, the remainder of those so engaged being students in the school of nursing, who serve without compensation. It is alleged in the answer that, during the year 1922, 393 persons were employed at the general hospital and paid by the city, which during that year expended the sum of $511,187.76 for general operating expenses, exclusive of any money expended by the University, and excluding also any amounts expended by the
 
 *267
 
 city for interest and sinking fund charges. It is specifically alleged in the answer that all of the buildings comprising the general hospital may be needed for general hospital purposes in the future, whenever necessity arises and funds are available for that purpose. It is admitted also that the University of the City of Cincinnati is a municipal university, organized long prior to the adoption of the city charter, and that it has in connection therewith a college of medicine, with a medical faculty and a school of nursing and health under the control of its board of
 
 directors;
 
 that it has erected a building for a medical school, through private subscription, costing approximately $503,000; that since May, 1921, it has secured a large endowment fund and has a sufficient income from the same to make improvements and the equipment required under the resolution of the board.
 

 The underlying purpose of the University directors in adopting the resolution setting apart a ward for medical research and surgical purposes was to establish a medical school where advanced principles and practice in surgery and medicine could be taught, which would attract surgeons and physicians of reputation and skill in the medical profession. It is alleged in the petition that in the judgment of the relators such policy would be of great benefit to the indigent sick persons in the city, relieve the taxpayers of a part of the burden now borne by them, and promote the establishment of a great medical school in the middle west. The foregoing are the controlling facts alleged in the pleadings, upon which the decision of this cause must rest.
 

 
 *268
 
 The .group of buildings comprising the general hospital was built.,by the city at a cost of about $2,365,000, which sum was derived from the sale .of bonds, and the cost of its operation and maintenance for the year Í922 was over half a million dollars exclusive of interest and sinking fund charges on bonds issued for the erection of the hospital. Undoubtedly, therefore, prior to the adoption of the city charter in 1917 the general hospital, including its control and management, was under the control of the city under the law of the state. Section 4035, General Code, then provided that the director of public safety should have the entire management and control of the hospital, subject to the ordinance of council as therein provided. If the city or its director of public safety has been divested of such power, it can only be because of controlling provisions in the city charter which lodge such power in the directors of the University. We must therefore look to the provisions of the city charter for such grant, if there be such.
 

 The two provisions of the. charter germane to the subject are:
 

 “V. Hospitals. 1. The administrative and executive work of the municipal hospitals shall be controlled and directed by the director of public safety, except as hereinafter stated.
 

 “2.
 
 The medical work, teaching and nursing in the hospitals shall be controlled and directed by the board of directors of the University of Cincinnati in the manner hereinafter stated.”
 

 We have already alluded to the fact that there can be no dual, incompatible control in relation to
 
 *269
 
 the setting aside -of a ward in the hospital. This control must' he lodged either in the director of public safety or in the.University directors. Furthermore, by reason of ownership, and because under the law control over the general hospital had for a long period of years been lodged in the city, before the latter should be divested of such control over its own buildings such divestiture should appear in no doubtful terms, and this is especially true where a writ of mandamus is asked, whefo the right thereto should be clear.
 

 An inspection of the two provisions in the city charter relating to hospitals discloses that the
 
 administrative and executive control
 
 is still lodged in the director of public safety, while the medical work, teaching, and nursing have been placed under the control of the University directors; not only that, but this medieial work, teaching, and nursing have been placed in the control of the University directors
 
 “in the manner hereinafter stated.”
 
 The provisions of the charter following, referring to hospitals, disclose that the control “hereinafter stated” relates to appointments and to manner and methods in which medical work and teaching should be conducted under the direct medical staff. There is no provision in the charter which gives absolute control of the city’s buildings to the University directors, or withdraws the administrative and executive control given to the directors of public safety by stipulation “V. 1” of the city charter. And it may be suggested that if the University board may designate a single ward for the purpose of medical use it - might, likewise, under the same power, designate other wards for like purposes, and
 
 *270
 
 thus seriously impinge upon the city’s purposes, use, and control for general hospital purposes if necessity therefor should hereafter arise.
 

 The record discloses that there has been extensive and mutual collaboration between the city and the college of medicine in general hospital work, which inures to the benefit of the public. This collaboration has been vouchsafed to both bodies by the charter of the city. The department of the college of medicine has been doing a large and useful work in connection with this hospital, and, by reason of its endowments now or hereafter aoquir ed, may attain the high accomplishments it entertains as set forth in the resolution of its board, and .to that extent the city authorities will no doubt fully lend their aid in the manner comprehended by the city charter. While the policy adopted by the University directors would, in the future, relieve the taxpayers of a part of the burden now borne by them, we are not concerned with the question of policy, but with that of power. It is possible and very probable with the growth of the city that, as alleged in the answer of the respondent, this or other wards may be required for the necessities of the city’s indigent.
 

 Whatever powers the board of University directors may have over the trust funds and income in their possession, they cannot, under the city charter, authorize private patients from whom compensation shall be received to be taken into this ward, without the consent of the proper authorities.
 

 The court is therefore of the opinion that the controlling facts admitted by the pleadings require
 
 *271
 
 that the demurrer to the answer he overruled, the writ denied, and the petition dismissed.
 

 Writ denied-.
 

 Marshall, C. J., Robinson, Jones, Matthias, Day and Allen, JJ., concur.
 

 Wanamaker, J., not participating.